732 So.2d 395 (1999)
Raymond S. PRINGLE, Jr., Ronald Fred Crum, and Willy Arnold, Appellants,
v.
MARINE FISHERIES COMMISSION, Florida Wildlife Federation, Florida League of Anglers, and Coastal Conservation Association, Appellees.
No. 98-979.
District Court of Appeal of Florida, First District.
March 31, 1999.
Rehearing Denied May 17, 1999.
Ronald A. Mowrey and L. William Porter III of Mowrey, Barrett & Minacci, P.A., Tallahassee, for Appellants.
Robert A. Butterworth, Attorney General; Jonathan A. Glogau, Assistant Attorney General, for Appellee Marine Fisheries Commission.
James Rhett Brigman, David Guest, and S. Ansley Samson of Earthjustice Legal Defense Fund, Tallahassee, for Appellees Florida Wildlife Federation, Florida League of Anglers, and Coastal Conservation Association.
PER CURIAM.
Raymond S. Pringle, Jr., Ronald Fred Crum, and Willy Arnold appeal an administrative law judge's order concluding that a rule amendment the Marine Fisheries Commission (MFC) proposed for adoption constituted a valid exercise of delegated legislative authority. We affirm.
The appellants are fishermen and ichthyophagists who initiated proceedings below with their petition challenging a proposed amendment to Florida Administrative Code Rule 46-4.0081 as an "invalid exercise of the authority delegated to the MFC under Florida Statutes." They contend that the proposed rule amendment did not meet certain criteria set forth in section 370.025(2), Florida Statutes (1997), which provides:
(2) All rules relating to saltwater fisheries adopted by the department pursuant to this chapter or adopted by the Marine Fisheries Commission and approved by the Governor and Cabinet as the Board of Trustees of the Internal Improvement Trust Fund shall be consistent with the following standards:
(a) The paramount concern of conservation and management measures shall *396 be the continuing health and abundance of the marine fisheries resources of this state.
(b) Conservation and management measures shall be based upon the best information available, including biological, sociological, economic, and other information deemed relevant by the commission.
(c) Conservation and management measures shall permit reasonable means and quantities of annual harvest, consistent with maximum practicable sustainable stock abundance on a continuing basis.
(d) When possible and practicable, stocks of fish shall be managed as a biological unit.
(e) Conservation and management measures shall assure proper quality control of marine resources that enter commerce.
(f) State marine fishery management plans shall be developed to implement management of important marine fishery resources.
(g) Conservation and management decisions shall be fair and equitable to all the people of this state and carried out in such a manner that no individual, corporation, or entity acquires an excessive share of such privileges.
(h) Federal fishery management plans and fishery management plans of other states or interstate commissions should be considered when developing state marine fishery management plans. Inconsistencies should be avoided unless it is determined that it is in the best interest of the fisheries or residents of this state to be inconsistent.
In keeping with section 370.093(6), Florida Statutes (1997), however, the MFC cited article X, section 16, Florida Constitution (the Net Ban Amendment), as well as sections 370.025 and 370.027, Florida Statutes, as the "law implemented" by the proposed amendment of Florida Administrative Code Rule 46-4.0081 that appellants challenge here.
In part, the Net Ban Amendment states: "No gill nets or other entangling nets shall be used in any Florida Waters[.]" Art. X, § 16(b)(1), Fla. Const. The proposed rule amendment provides that "[b]eginning January 1, 1998, no person shall fish with, set, or place in the water any seine net with a mesh size larger than 2 inches stretched mesh." Fla. Admin. Code. R. 46-4.0081(2)(d). In effect, the rule amendment appellants challenge defines "other entangling nets" to include "any seine net with a mesh size larger than 2 inches stretched mesh."
Before the Net Ban Amendment took effect, fishermen deployed seine nets several thousand square feet in area in Florida waters. But most of the traditional seine net, the part known as the wings, served simply to guide fish into a "pocket" in the center of the net comprising only about three per cent of the net's total area. Invoking this ratio, after the Net Ban Amendment took effect, fishermen designed a 500-square-foot "seine net" that consisted of a central panel of two-inch mesh and "wings" of three-inch mesh.
At least until the Net Ban Amendment took effect, mullet was the predominant commercial fishery in Florida. Citing Department of Environmental Protection v. Millender, 666 So.2d 882, 887 (Fla.1996) ("in the context of the amendment's stated purpose, which is to limit rather than prohibit shrimp trawl fishing, evidence of the nets' commercial viability is relevant"), appellants put on evidence that a 500-square-foot net consisting only of two-inch mesh could not be used to take mullet in a commercially viable way. On the other hand, they put on evidence that a net with only fifteen square feet of two-inch mesh and 485 square feet of three-inch mesh (the Pringle-Crum net) was commercially viable for catching mullet.
The administrative law judge credited appellants' evidence that a 500-square-foot net with a uniform mesh of two inches would not be commercially viable for *397 catching mullet. The judge found further, however, that the commercial viability of the Pringle-Crum net was attributable solely to the fact that the Pringle-Crum net "gilled" mullet:
Three-inch mesh in the wings of seine nets would gill larger, commercially viable mullet. There is no practical way to construct a seine with wings and a workable pocket since the entire seine net is limited to a total of 500 square feet, but if the three-inch mesh continues to be permitted for the wings, fishermen will be able to construct 500 square foot seine nets that are 90 percent wing and 10 percent panel, thus converting what is technically a seine net into one which actually gills or entangles fish over 90 percent of the net's surface. Such a result would be contrary to any common historical understanding of what constitutes a "seine net," and contrary to the intent of the constitutional amendment and subsequent legislation.
The administrative law judge thus found that the Pringle-Crum net constituted a gill or entangling net. A net disallowed by the Net Ban Amendment cannot lawfully be used, whatever its commercial viability. The Net Ban Amendment specifically states that "[n]o ... entangling nets shall be used in any Florida Waters." Art. X, § 16(b)(1), Fla. Const.
The administrative law judge concluded, moreover, that nets that meet the requirements of the proposed amendment to Florida Administrative Code Rule 46-4.0081(2)(d) were commercially viable for taking fish other than mullet. Crediting expert opinion testimony, the administrative law judge also concluded that nets lawful under the proposed rule amendment could catch mullet in commercial quantities when used in conjunction with cast nets. Whether or not this expert testimony was correct, the administrative law judge's thorough order leaves no doubt that the matter of commercial viability was considered in reaching the conclusion that the amendment MFC proposed was a valid exercise of delegated authority.
Section 370.093(6), Florida Statutes (1997), grants the MFC the authority "to adopt rules pursuant to ss. 370.025 and 370.027 implementing the prohibitions and restrictions of s. 16, Art. X of the State Constitution." Section 370.027(2), Florida Statutes (1997), permits the MFC to make rules imposing fishing gear specifications and prohibitions as long as those rules meet the criteria of section 370.025(2), Florida Statutes (1997). In implementing the Net Ban Amendment, the MFC is also implementing its own governing statutes. The courts are bound to give deference to an agency's interpretation of statutes the agency is charged with implementing. See, e.g., Florida Interexchange Carriers Ass'n v. Clark, 678 So.2d 1267, 1270 (Fla. 1996) ("[A]n agency's interpretation of a statute it is charged with enforcing is entitled to great deference and will be approved by this Court if it is not clearly erroneous.").
AFFIRMED.
MINER and BENTON, JJ., CONCUR.
VAN NORTWICK, J., SPECIALLY CONCURS WITH WRITTEN OPINION.
VAN NORTWICK, J., specially concurring.
I cannot agree that competent substantial evidence supports the administrative law judge's findings that the net restrictions of the proposed rules are commercially viable for use in the mullet fishery, the acknowledged focus of the proposed rules. In Department of Environmental Protection v. Millender, 666 So.2d 882, 887 (Fla.1996), the Florida Supreme Court explained that, in considering whether a shrimp trawl satisfied the requirements of subsection (b)(2) of the Net Ban Amendment, article X, section 16(b)(2), Florida Constitution, "evidence of the net's commercial viability is relevant." I admit that it is somewhat unclear to me how this commercial viability test is to be applied in *398 the context of this challenge to a proposed administrative rule. Nevertheless, I find no competent substantial evidence below which supports the finding that the nets authorized by the proposed rule would be commercially viable as seine nets for mullet. The administrative law judge found that the use of a single seine which complied with the proposed rules "is not commercially feasible for fishing mullet, except possibly in roe season." Yet the administrative law judge found the net restrictions commercially feasible for mullet fishing based solely on testimony of the following:
[t]here are at least two ways the new net could be used commercially. It is possible for two fishermen working together to deploy two separate 500 square foot, two-inch mesh seine nets to capture and corral legal size mullet. It is possible to use two legal seine nets in the same way with a third person manning a cast net. The seine nets would be channeling, or herding, the fish, and the cast net would be gathering or dipping them out of the water. Under this type of operation, neither type of net would entangle or gill fish.
There is no evidence, however, that this speculative, theoretical, Rube Goldberg-like method of fishing is at all viable or practical. Bare speculation about a theoretical fishing method cannot constitute competent substantial evidence to support a finding of commercial viability. LeMaster v. Glock, 610 So.2d 1336, 1338 (Fla. 1st DCA 1992), rev. denied, 620 So.2d 760 (Fla.1993).
I would nonetheless affirm. Competent substantial evidence does support the finding that the Pringle-Crum net and other mullet nets that would be prohibited by the proposed rules can take mullet in a commercially viable manner only when used as gill or entangling nets. Subsection (b)(1) of The Net Ban Amendment, article X, section 16(b)(1), Florida Constitution, expressly prohibits the use of entangling nets in Florida waters. I do not believe that the Millender commercial viability test adopted under subsection (b)(2) of the Amendment is applicable to a rule that simply applies the prohibition in subsection (b)(1) here. Thus, to the extent that the proposed rules work to implement the prohibition of entangling nets in subsection (b)(1) of The Net Ban Amendment, I agree that the proposed rules constitute a valid exercise of delegated legislative authority.